Robert T. McCLELLAN, Relator,

v.

NORTHWEST AIRLINES, INC., Respondent,

Department of Economic Security, Respondent.

No. 51329.

Supreme Court of Minnesota, En Banc.

April 3, 1981.

Patrick Brennaman, Air Line Pilots Association, Minneapolis, for relator.

Michael Fahey, Northwest Airlines, Inc., Warren Spannaus, Atty. Gen. Dept. of Economic Security, St. Paul, for respondents.

OTIS, Justice.

This case comes here on a writ of certiorari to review a decision of a Representative of the Commissioner of the Department of Economic Security. The Commissioner's representative concluded that an arbitration award of back pay and the time covered by that award do not constitute "wage credits" and "credit weeks" respectively for the purpose of computing the unemployment compensation benefits to

which an employee is entitled when his employer wrongfully causes him to be involuntarily unemployed for the second successive time. We hold that the decision does not conform with the terms of the Minnesota Employment Services Law, Minn.Stat. § 268.04 (1980), and, therefore, we reverse.

The facts are not in dispute. The relator, Robert C. McClellan, had been employed as a pilot since 1952, by respondent Northwest Airlines. In March 1977, Northwest Airlines suspended the relator for three months for alleged misconduct. During that time the relator underwent treatment for alcoholism.

In June 1977, Northwest Airlines placed the relator on an indefinite, involuntary, unpaid, personal leave of absence. While on that status, relator did not file a claim for involuntary unemployment compensation.

In October 1977, the Federal Aviation Administration (F.A.A.) issued an exemption to the relator. The exemption would allow him to resume work as an airline pilot despite the prior diagnosis of alcoholism; the F.A.A., however, conditioned the exemption on Northwest Airlines arranging for its personnel to monitor relator's abstinence from alcohol. Northwest Airlines refused to make the arrangements, thereby preventing relator from returning to work.

In April 1978, the F.A.A. modified the exemption, removing the condition that relator be monitored. Northwest Airlines refused to return the relator to active pilot status.

The subsequent forty-seven weeks of additional involuntary unemployment are the focus of the controversy. The relator was able, ready, and willing to work. Northwest Airlines would not let him work. Relator filed a grievance with a collective bargaining arbitration board, the NWA/ALPA System Board of Adjustment. On March 22, 1979, the board decided that the relator had been wrongfully suspended during the forty-seven weeks, and ordered him to be "returned to active service immediately and made whole for wages and other benefits lost since April 13, 1978, with appropriate deductions for interim income received from other sources."

On July 16, 1979, fifteen weeks after the relator had resumed work, Northwest Airlines again placed him on an indefinite, involuntary, unpaid, personal leave of absence. This time the relator filed for involuntary unemployment compensation. A claims deputy for the Department of Economic Security, Unemployment Insurance Division, denied compensation to the relator, apparently on the ground that he had not been wrongfully suspended. An appeal tribunal reversed that ruling and granted the relator compensation.

Pursuant to Minn.Stat. § 268.07, subd. 2 (1980),[1] the Department of Economic Secur-

---

1. Minn.Stat. § 268.07, subd. 2 (1980) provides: Weekly benefit amount and duration. If the commissioner finds that an individual has earned 15, or more, credit weeks, and $750 or more in wage credits, within the base period of employment in insured work with one or more employers, benefits shall be payable to such individual during his benefit year as follows:

(1) Weekly benefit amount shall be equal to 60 percent of the first $85, 40 percent of the next $85 and 50 percent of the remainder of the average weekly wage of such individual, computed to the nearest whole dollar, subject to a maximum of 62 percent of the average weekly wage paid to individuals by employers subject to the provisions of sections 268.03 to 268.24 as to claims for benefits which establish a benefit year subsequent to June 30, 1977 and prior to July 1, 1978. The maximum weekly benefit amount of claims for benefits which establish a benefit year subsequent to June 30, 1978 and

prior to July 1, 1979 shall be 64 percent of said average weekly wage. The maximum weekly benefit amount of claims for benefits which establish a benefit year subsequent to July 1, 1979 shall be 66⅔ percent of said average weekly wage.

On or before June 30 of each year the commissioner shall determine the average weekly wage paid by employers subject to sections 268.03 to 268.24 in the following manner:

(a) The sum of the total monthly employment reported for the previous calendar year shall be divided by 12 to determine the average monthly employment.

(b) The sum of the total wages reported for the previous calendar year shall be divided by the average monthly employment to determine the average annual wage.

(c) The average annual wage shall be divided by 52 to determine the average weekly wage.

ity computed the compensation benefits from a sum of the relator's total monthly employment wages for the previous year.[2] The Department initially included in its computations the back pay the relator received for the forty-seven weeks of wrongful suspension. Subsequently, the Department redetermined the relator's compensation, reducing his accumulated wage credits for the previous year from $44,021.37, based on forty-seven credit weeks, to $15,040.88, based on fifteen credit weeks. This redetermination thereby treated the relator as if he had been "unemployed" during the forty-seven weeks of wrongful suspension, and therefore, during the next wrongful suspension he would not be allowed to receive benefits based on the back pay he had been awarded. The Department would not treat back pay as "wage credits" nor the time of wrongful suspension as "credit weeks" within the meaning Minn.Stat. § 268.04, subds. 26 and 29 (1980).

After an appeal tribunal affirmed the redetermination of the relator's unemployment compensation benefits, and a Representative of the Office of the Commissioner for the Department of Economic Security affirmed the decision of the appeal tribunal, we issued a writ of certiorari to review the Commissioner Representative's decision, and in particular, his construction of Minn. Stat. § 268.04, subds. 26 and 29 (1980).

The question for decision concerns a rare occurrence, that of computing the unemployment compensation benefits to which an employee is entitled when his employer has wrongfully caused him to be involuntarily unemployed for a second successive time. The question is whether an arbitration award of back pay and the period of wrongful suspension and involuntary unemployment for which it was awarded constitute "wage credits" and "credit weeks," respectively, under Minn.Stat. § 268.04, subds. 26 and 29 (1980), for the purpose of computing the unemployment compensation benefits to which the employee is entitled during that second interval of involuntary unemployment?

Minn.Stat. § 268.04, subd. 26 (1980) defines the term "wage credits" to mean:

> the amount of wages paid and wages due and payable but not paid by or from an employer to an employee for insured work and tips and gratuities paid to an employee by a customer of an employer and accounted for by the employee to the employer except that wages earned in part-time employment by a student as an integral part of an occupational course of study, under a plan for vocational education accepted by the Minnesota department of education, shall not result in wage credits available for benefit purposes.

*Id.* (emphasis added).

Minn.Stat. § 268.04, subd. 29 (1980), defines the term "credit week" to mean:

> any week for which wages have been paid and wages are due and payable but not paid of $50 or more by or from one or more employers to an employee for insured work.

*Id.* (emphasis added).

"Wage credits" and "credit weeks" are thus defined respectively as a measured quantity of "wages" received for "insured work" and as a quantity of time during

---

The maximum weekly benefit amount as so determined computed to the nearest whole dollar shall apply to claims for benefits which establish a benefit year which begins subsequent to June 30 of each year.

(2) An individual's maximum amount of regular benefits payable in a benefit year shall not exceed the lesser of (a) 26 times his weekly benefit amount or (b) 70 percent of the number of credit weeks earned by such an individual computed to the nearest whole week times his weekly benefit amount.

(3) Each eligible individual who is unemployed in any week shall be paid with respect to such week a benefit in an amount equal to his weekly benefit amount less that part of his earnings, including holiday pay, payable to him with respect to such week which is in excess of $25. Such benefit, if not a multiple of $1, shall be computed to the next higher multiple of $1.

(4) The provisions of this subdivision shall apply to claims for benefits which establish a benefit year subsequent to June 30, 1975.

2. Relator's monthly wage averaged between $5,300 and $5,400.

which those "wages" were received for the "insured work." The statute, however, also defines "wages" and "insured work," and thereby makes them into special terms.

Minn.Stat. § 268.04, subd. 25 (1980) defines "wages" to mean:

> all remuneration for services, including commissions and bonuses, and tips and gratuities paid to an employee by a customer of an employer and accounted for by the employee to the employer, and the cash value of all remuneration in any medium other than cash, * * *.

Id. (emphasis added).

Minn.Stat. § 268.04, subd. 17 (1980) defines "insured work" to mean: "employment for employers as defined in this section * * * ;" under. Minn.Stat. § 268.04, subd. 12 (1980) the term "employment" is defined to mean,

> service performed * * * by an individual who is a servant under the law of master and servant or who performs services for any employing unit, unless such services are performed by an independent contractor.

Id. (emphasis added).

From the definition of "employment" the commissioner's representative inferred that "unemployment" compensation can only be based on the receipt of wages for which the employee performed a service. By that reasoning, the relator, though wrongfully suspended, had exerted no effort for which he later received "back pay," and, therefore, was not employed during the suspension. The commissioner's representative concluded that the legislature did not intend employees to establish unemployment benefit claims based upon periods when they are not performing services.

That reasoning overlooks one decisive fact: the employer had wrongfully prevented the relator from performing services. The legislature did not intend to penalize a wrongfully suspended employee and to reward his employer for ill-treating him. The arbitration award provided that the relator be "made whole for wages and benefits lost * * *." We hold that when there is an arbitration award of back pay for a period of wrongfully caused involuntary unemployment the award constitutes "wage credits" and the time it covered constitutes "week credits" for the purposes of computing unemployment compensation benefits during a subsequent period of another wrongful suspension from work. We are not holding that every receipt of back pay will count as "wage credits" and the time covered as "week credits;" situations may arise in which we might decide to the contrary. We do not attempt to decide those instances now.

The decision of the Representative of the Commissioner of the Department of Economic Security is reversed and remanded with directions to enter an award consistent with this opinion.