Michael J. MRKONJICH, Relator,

v.

ERIE MINING COMPANY, Respondent,

and

Commissioner of Economic Security,
Respondent.

Duane E. FOGERTY, Relator,

v.

DEPARTMENT OF CORRECTIONS,
Respondent,

and

Commissioner of Economic
Security, Respondent.

Nos. C3–82–1003, C7–82–1344.

Supreme Court of Minnesota.

May 20, 1983.

Rehearing Denied July 18, 1983.

Peterson, Engberg & Peterson, Mark W. Bay, Minneapolis, for relator Mrkonjich.

Duane E. Fogerty, pro se.

Hubert H. Humphrey, III, Atty. Gen., Thomas R. Nelson, Asst. Atty. Gen., St. Paul, for respondent Com'r of Economic Sec.

TODD, Justice.

The above matters have been consolidated on appeal. Each involves a denial of unemployment compensation. The basis for denial in each case was that the relevant benefit year included a period of time covered by a back pay award. The Department of Economic Security ruled that the time accounted for by the back pay period could not be credited in computing eligibility for unemployment compensation. We reverse.

Michael Mrkonjich worked for the Erie Mining Company ("Erie") as a pipe changer from May 1, 1978, to August 1, 1979, when he was discharged for misconduct. He filed a claim for unemployment benefits effective August 5, 1979, and grieved his discharge under the applicable collective bargaining agreement on August 7, 1979. The Department of Economic Security disqualified Mrkonjich for benefits on August 23, 1979, because he was discharged for misconduct. An appeal tribunal affirmed the Department's determination on September 28, 1979. Mrkonjich took no further appeal. Mrkonjich found employment with the Willow Manufacturing Co. ("Willow") and worked from March 10, 1980 to June 6, 1980. He earned $3,234.90 and 13 credit weeks. Meanwhile, Mrkonjich's grievance proceeded to arbitration under Erie's collective bargaining agreement with the union there. On May 8, 1980, the Iron Ore Industry Board of Arbitration heard Mrkonjich's grievance. On June 4, 1980, the Board modified the discharge from Erie to a 10-day suspension without pay, and reinstated him to his position at Erie, with back pay for 43 weeks, totalling $16,859.99. The award did not offset Mrkonjich's earnings at Willow.

Mrkonjich left his job at Willow and began to work again for Erie on June 10, 1980. He worked on June 10, 11 and 12, when he was separated from employment again, due to lack of work.

Mrkonjich filed for unemployment benefits under his existing unemployment claim (originally filed after his separation from Erie, August 5, 1979). He received $900 in benefits for the period June 21, 1980—August 2, 1980. Mrkonjich then filed a new claim, effective August 3, 1980, to establish a new benefit year. To establish a "valid claim," Mrkonjich had to work at least 15 weeks in the 52-week period immediately preceding August 3. Minn.Stat. § 268.07, subd. 2 (1980). The Department issued a "Notice of Determination on Initial Claim for Benefits" on August 21, 1980, which found that Mrkonjich worked 13 credit weeks for Willow and 1 credit week for Erie. Relator lacked 1 week to establish a valid claim. The appeal tribunal affirmed the Department's findings, despite relator's contention that the back pay award constituted wage credits and credit weeks. The appeal tribunal concluded that, "[T]he Department has traditionally held, for wage credit and credit week purposes, that an arbitration award of this kind is payment of damages."

Mrkonjich appealed to the Commissioner, arguing that the Department's policy to construe a back pay award as damages, not as wages, exceeded the limits of administrative interpretation of the Minnesota Unemployment Services Law. Also, he argued that the Department should have satisfied rulemaking procedures under the Minnesota Administrative Procedures Act before it instituted a "rule" such as this. The Commissioner affirmed the decision of the appeal tribunal to exclude Mrkonjich's back pay award from the wage credit and credit week determination, relying on *McClellan v.*

*Northwest Airlines, Inc.,* 304 N.W.2d 35 (Minn.1981).

Duane E. Fogerty worked for the Minnesota Department of Corrections as a Correctional Counselor III Supervisor, from 1976, until December 4, 1980, when he was discharged for alleged illegal strike activities. Fogerty applied for and received unemployment benefits. The Department of Corrections appealed the decision to grant benefits to an appeal tribunal. The appeal hearing was postponed, however. Fogerty had challenged his discharge under Minn.Stat. § 43.24, subd. 2 (1980), which provides for a contested case hearing before a hearing examiner. The unemployment appeal hearing was postponed until the results of the contested case hearing were known.

The contested case, following bifurcated hearings on wrongful termination (report issued July 21, 1982) and damages (report issued September 21, 1982), resulted in findings that Fogerty had not participated in the illegal strike and that he was therefore wrongfully terminated, that he be reinstated, that he receive $30,983.03 in back pay for the period from his termination until June 30, 1982, and that he be paid from July 1, 1982, until his reinstatement at the rate he would have earned had he not been terminated.

On November 23, 1982, the parties reached a negotiated settlement of all claims by Fogerty against the Department of Corrections. The settlement provided that Fogerty receive $45,000 in exchange for relinquishing his claims against the Department of Corrections, including claims for "back pay, compensatory damages, retirement and other benefits, and attorneys' fees and costs * * * " The agreement implied that Fogerty would resign as a provision of this agreement: "The State and Fogerty agree that in the event that the State is asked for any information concerning the reason for Fogerty's departure from State employment, the State may and shall respond that Fogerty resigned." $42,500 of the award was made subject to federal, state and FICA taxes.

Fogerty did not work from his discharge on December 4, 1980 to February 1, 1982, when he found employment with the Middle Management Association. He was forced to resign on February 6, 1982, allegedly because of pressure from the Department of Corrections.

Fogerty applied for unemployment benefits again on February 9, 1982. Relator had to establish a valid claim in a new benefit year, effective February 7, 1982. The claims deputy denied Fogerty benefits, as he had worked only one week, 14 weeks less than the 15 required for a valid claim. The amount received in the settlement agreement was not included in the calculation of wage credits or credit weeks. An appeal tribunal affirmed the claims deputy. The Commissioner affirmed the appeal tribunal.

The issue is whether back pay awards constitute wages for the purpose of determining subsequent unemployment compensation benefits. This court in *McClellan v. Northwest Airlines, Inc.,* 304 N.W.2d 35 (Minn.1981), decided that a back pay award does constitute wages, at least in the situation where an employer has wrongfully caused an employee to be involuntarily unemployed for a second successive time. *Id.* The instant cases present the court with the opportunity to limit *McClellan* to its narrow fact situation or to expand it to encompass the present facts.

McClellan worked as a pilot for Northwest Airlines from 1952–1977. In June 1977, the airlines suspended relator for misconduct. After relator was treated for alcoholism, the F.A.A. ruled that relator could return to work; however, the airlines refused to return him to active pilot status. Following 47 weeks of additional involuntary unemployment, the arbitration board for relator's union ordered the airline to return him to service and awarded him back pay and benefits.

Fifteen weeks after McClellan resumed work, the airlines again placed him on involuntary personal leave of absence. McClellan filed for unemployment compensation but was denied. An appeal tribunal reversed and awarded McClellan benefits

but did not include the 47 weeks' back pay in the computation. This court remanded the case with directions to the Commissioner to include the back pay amount in the computation of McClellan's unemployment compensation benefits. The court refuted the Commissioner's argument that unemployment compensation can only be based on the receipt of wages for which the employee performed a service.

> That reasoning overlooks one decisive fact: the employer had wrongfully prevented the relator from performing services. The legislature did not intend to penalize a wrongfully suspended employee and to reward his employer for ill-treating him. * * * We hold that when there is an arbitration award of back pay for a period of wrongfully caused involuntary unemployment the award constitutes "wage credits" and the time it covered constitutes "week credits" for the purposes of computing unemployment compensation benefits during a subsequent period of another wrongful suspension from work.

304 N.W.2d at 38.

The court cautioned that:

> We are not holding that every receipt of back pay will count as "wage credits" and the time covered as "week credits;" situations may arise in which we might decide to the contrary. We do not attempt to decide those instances now.

*Id.*

Minn.Stat. § 268.07, subd. 2 (1980), provides that an individual can receive unemployment benefits if s/he "has earned 15, or more, credit weeks, and $750 or more in wage credits, within the base period of employment in insured work with one or more employers * * *." [1] "Insured work," defined by Minn.Stat. § 268.04, subd. 17 (1980), means: "employment for employers as defined in this section * * *." Minn. Stat. § 268.04, subd. 12(1) (1980), defines "employment" as:

[S]ervice performed * * * by an individual who is a servant under the law of master and servant or who performs services for any employing unit, unless such services are performed by an independent contractor.

The statute contemplates that unemployment compensation benefits will be computed based on the number of weeks an "employee" spends performing "services" for an "employer." "Services" is not explicitly defined by the statute, and the interpretation of this term is the basis of the dispute here.

The Commissioner argues that "services" should be defined according to its common usage, as it is not specifically defined by statute. Further, Minn.Stat. § 645.16(8) (1980), provides that administrative interpretations of a statute may provide a guide to legislative intent. "Services," to the Commissioner, means labor performed for another. For more than ten years the Commissioner has followed this common definition and has determined that back pay, which accrues during a period of "enforced idleness," does not constitute service under the statute.

Relators argue that "services" must be defined more broadly. In *Social Security Board v. Nierotko,* 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946), the Supreme Court determined that back pay constitutes "wages" for the purpose of determining quarters of coverage under the Social Security Act. The parties in *Nierotko* made similar arguments to those in the instant case. There the court found:

> Surely the "back pay" is "remuneration." * * * "Back pay" is not a fine or penalty imposed upon the employer by the Board. Reinstatement and "back pay" are for the "protection of the employees and the redress of their grievances" to make them "whole."
>
> * * * * * *
>
> Since Nierotko remained an employee under the definition of the Labor Act,

1. Minn.Stat. § 268.07, subd. 2 (1982), no longer requires any wage credits within the base period.

although his employer had attempted to terminate the relationship, he had "employment" under that Act and we need consider further only whether under the Social Security Act its definition of employment, as "any service . . . performed . . . by an employee for his employer," covers what Nierotko did for the Ford Motor Company. The petitioner urges that Nierotko did not perform any service. It points out that Congress in considering the Social Security Act thought of benefits as related to "wages earned" for "work done." We are unable, however, to follow the Social Security Board in such a limited circumscription of the word "service." The very words "any service . . . performed . . . for his employer," with the purpose of the Social Security Act in mind, import breadth of coverage. They admonish us against holding that "service" can be only productive activity. *We think that "service" as used by Congress in this definitive phrase means not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer.*

*Id.* at 364–66, 66 S.Ct. at 641 (footnotes omitted) (emphasis added).

Relators rely on *Nierotko* to argue that they would have been performing services for their employers but for their wrongful suspensions from work. The periods of idleness they experienced came through no fault of their own. When the back pay awards were made, they were treated like wages relators would have earned for the idle period; state, federal and FICA taxes were deducted. As under the Social Security Act, relators contend, "services" here should encompass the period for which back pay was awarded.

This court developed a narrower rule in *McClellan* than that adopted by a number of other jurisdictions and that articulated by the U.S. Supreme Court in *Nierotko.* This court determined that back pay should be counted in the determination of wage credits and credit weeks only when the employer lays off an employee wrongfully for the second successive time. The instant cases point up the difficulty and potential inequities in applying such a rule. Mrkonjich was discharged at first for misconduct; his discharge was ultimately modified to a ten-day suspension. He was laid off again for lack of work, only three days after returning to work at Erie. Fogerty was fired for allegedly participating in an illegal strike; ultimately, an arbitration board ruled that his twin brother had participated in the strike and that Duane Fogerty was fired wrongfully. He was laid off from his next job, allegedly as a result of pressure from his first employer on his second employer.

Under the *McClellan* rule, Mrkonjich should not receive unemployment benefits presently, as his second layoff resulted from a lack of work, not a wrongful suspension. His back pay award would not count toward a determination of credit weeks and wage credits for purposes of present unemployment compensation. Fogerty's back pay award would not count either, since his second layoff came from alleged wrongful pressure exerted by his first employer on his second employer to fire him. His second layoff was not the second *successive* layoff by the same employer and would therefore not fall within the bounds of the narrow *McClellan* rule. These results are harsh and, especially if Fogerty's second layoff resulted from pressure as he contends, are unfair and contrary to the purpose of which *McClellan* was written, to prevent an employer's wrongful act from depriving a claimant of unemployment compensation benefits.

Factual determinations of the reasons for Mrkonjich's and Fogerty's second layoffs have not yet been made, but these determinations would have to be made by the Department of Economic Security under the narrow *McClellan* rule before determining whether the back pay award in each case should be counted as wages for each relator's subsequent unemployment claim. The Department would have to set up a procedure for future cases whereby a claims deputy or another trier of fact within the De-

partment could determine whether a second layoff was wrongful. Such a determination would necessarily take time and would prevent unemployment benefits from reaching these and future relators for a period of time. Further, such a determination may lead to differing results, such that back pay would be "wages" in one case and not "wages" in another case. The time spent on a factual determination of the reason for a second layoff does not comport with the policy of the unemployment statutes, to deliver benefits quickly to those who qualify. Nor does the probability of differing results in various cases aid in clearly characterizing back pay awards for the guidance of arbitration boards, employers and employees who are or will be involved in back pay disputes. The character of back pay will depend on subsequent and unrelated events, not on the events which gave rise to the need for a back pay award. The rationale in *McClellan,* that the employee would have been performing services for the employer but for the employer's wrongful suspension of him or her, holds whether or not the second suspension was also wrongful. The analogous U.S. Supreme Court decision in *Nierotko,* policy reasons and case law from other jurisdictions [2] all point to the need to expand the *McClellan* rule and to define clearly the character of back pay awards in subsequent unemployment compensation claims.

■ We adopt a broader rule. When an employee has previously been wrongfully separated from employment by an employer, and a back pay award has been ultimately made to the employee, an unemployment compensation claims deputy should include the period for which back pay is awarded in a subsequent determination of "credit weeks" and "wage credits." [3] This rule, of course, applies only where the back pay award period falls within the base period for the subsequent unemployment compensation claim.

The Commissioner raises a related question in his brief: if "services" is defined to include the back pay award period, should any unemployment compensation benefits paid during the back pay period be recovered by the Department of Economic Security? Mrkonjich, in the instant appeal, received no unemployment compensation during the period covered by the back pay award. Fogerty, however, received $4,212 in unemployment benefits, which were set off against the back pay award of $35,640.03, pursuant to the settlement agreement reached between him and the Department of Corrections.

Minn.Stat. § 268.18, subd. 1 (1980), provides in relevant part:

> Subdivision 1. **Erroneous payments.** Any claimant for benefits who, by reason of his own mistake or through the error of any individual engaged in the administration of sections 268.03 to 268.24, has received any sum as benefits to which he was not entitled under these sections, shall promptly return such benefits in cash to the nearest office of the Minnesota department of economic security. If such claimant fails to return such benefits, the department of economic security shall, as soon as it discovers such erroneous payment, determine the amount thereof and notify said individual to return the same * * * In the event that the claimant fails to return * * * the benefits * * * the commissioner of the department of economic security is hereby authorized to deduct from any future

2. See *Kerin v. California Unemployment Insurance Appeals Board,* 87 Cal.App.3d 146, 150 Cal.Rptr. 751 (1978) (back pay award treated as wages for purposes of determining wage credits and credit weeks); *Hiserote Homes, Inc. v. Riedemann,* 277 N.W.2d 911 (Iowa 1979) (back pay award is "wages" and claimant is therefore unable to receive unemployment compensation for back pay period); *White v. Commonwealth,* 36 Pa.Commw. 258, 387 A.2d 943 (1978) (back pay constitutes "wages"); *Griggs v. Sands,* 526 S.W.2d 441 (Tenn.1975)

(back pay constitutes "wages" and therefore disentitles claimant to unemployment compensation benefits); *Texas Employment Commission v. Busby,* 457 S.W.2d 170 (Tex.Civ.App. 1970) (back pay constitutes "wages"; claimant must repay unemployment compensation payments made during back pay period).

3. Under the present statute, "wage credits" will not need to be computed. See footnote 1, *supra.*

benefits payable to such claimant * * * in the current or any subsequent benefit year an amount equivalent to such erroneous payment.

The Department of Economic Security may seek repayment under this statute from Fogerty of the amounts he received in unemployment compensation during the back pay period. Such a result would harm Fogerty, in that the benefit amount was already deducted from the amount the Department of Corrections paid him. The legislative intent manifested in Minn.Stat. § 268.18, subd. 1 (1980), is that the employee not be unjustly enriched by receipt of benefits for which s/he is subsequently discovered to have been ineligible. The section is not intended to enrich the employer where, as here, the employer has already deducted the amount of benefits paid Fogerty from the settlement award. The employer, having no valid claim to the compensation benefits money should be required to refund the amount to the Department of Economic Security. *See Department of Labor and Industry v. Smalls,* 153 N.J.Super. 411, 379 A.2d 1283 (1977). In this case, the Department of Corrections should reimburse the Department of Economic Security in the amount of $4212, which was deducted from the back pay due to Fogerty.

Reversed.